sonal services rendered to the American Stock Exchange, other than certain specific allowances, to be made conditional by certain credits on the books of the Mining & Industrial Exchange; and finally they authorized the secretary to issue a circular stating that he was instructed by the managing committee of the American Stock Exchange to submit a certain statement, substantially as follows: That, owing to internal disputes and mismanagement of the New York Mining Exchange, "that institution is in the hands of a receiver, and a strong demand has arisen for the establishment of a new exchange, to take up the business under conditions of greater stability," etc.; that several propositions have been made to the American Stock Exchange to undertake the business in question, and these propositions are accompanied by the assurance of sufficient support; that the managing committee have decided forthwith to establish the exchange, and the name under which the business will be carried on will be the Mining & Industrial Exchange of New York; and if, upon consideration of the foregoing, the party to whom the circular is addressed desires to become one of the governing members of the exchange, it will be necessary at once to send in an application on an accompanying form. That the Mining & Industrial Exchange was intended to be a new organization appears from its recognizing and adopting certain liabilities of the American Stock Exchange, and not others. No such discrimination could be made if there were a mere change of name. The initial agreement for the Mining & Industrial Exchange was entered into on May 14, 1896, and the circular was issued May 19, 1896. This was about a month after the defendant Haines had paid in his subscription as a member of the American Stock Exchange, as appears by his check dated April 15, 1896; and it is not shown that, in response to the circular above referred to, he made any application to join the Mining & Industrial Exchange, which, it is evident from the foregoing facts, was a new concern, and not the organization to which he had subscribed. The work done by the plaintiff's assignor, as appears from the bill in evidence, was performed for the new concern after its organization, and not for the American Stock Exchange, of which alone the defendant Haines was a member. No indebtedness of defendant to the plaintiff or his assignor, therefore, is shown.

Judgment reversed; new trial ordered; costs to appellant to abide the event. All concur.

---

(17 App. Div. 116.)

## WEST v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. April 10, 1897.)

FELLOW SERVANTS—CAR INSPECTOR AND TRAINMEN.

A car inspector, after finishing his work at the point to which he had been sent, could have returned home on a passenger train in the evening, but he spent the evening visiting friends, and took a freight train home at midnight. He had no pass authorizing him to travel on the freight train, and he was not in his working costume, but was nevertheless permitted by the conductor to ride. Held, that he was not, while on such train, a fellow servant with the trainmen, so as to render the company liable for having

in its employ an incompetent trainman, in consequence of whose incompetence the car inspector was killed.

Ward, J., dissenting.

Appeal from circuit court, Wayne county.

Action by Nettie West, as administratrix of Charles E. West, deceased, against the New York Central & Hudson River Railroad Company, to recover damages for the death of plaintiff's intestate. From a judgment entered on a verdict for $5,000 in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, GREEN, and WARD, JJ.

Albert H. Harris, for appellant.

E. S. Jenney, for respondent.

GREEN, J. This action was brought to recover damages sustained by reason of the death of plaintiff's son, claimed to have been caused by the negligence of the defendant in keeping in its employment an incompetent brakeman. Plaintiff's intestate, Charles E. West, who was 20 years of age, and 4 years in defendant's employ, was killed on the morning of August 6, 1891, in what has been known as the "Montezuma Wreck," upon the West Shore Railroad, at that time operated by the defendant. The accident was occasioned by the west-bound passenger train, known as "No. 3," coming into collision with the rear end of an extra freight train, in the caboose of which West was riding. Upon the day of the accident West was employed at Newark by defendant as a car inspector, and, with eight other employés, was under the superintendency of Van Wie, foreman at that point. There was a car inspector stationed at Weedsport, named Traub, who was (it is claimed) to some extent under Van Wie's direction. Van Wie testified, in a general way, that his predecessor at Newark had exercised superintendency over Traub, and that he himself also claimed to exercise and did exercise such superintendency. This was explicitly denied by the company. Van Wie also testified that the master mechanic, Garrison, had requested him to keep his eyes upon Traub, "and see how he got along," but this was denied. Van Wie was discharged from the company's service. On the 5th of August, 1891, West went from Newark to Weedsport, which is 31 miles east. He went on passenger train known as "No. 2," which leaves Newark at 11:55 a. m., and reaches Weedsport at about 12:30. The plaintiff claims that he was sent to Weedsport by Van Wie, the foreman, to see how Traub, the car inspector at the former place, was attending to his duties. The defendant claims that he went to see Miss McNierny, a girl to whom he was engaged, and that the claim that he was sent on an errand connected with his employment had been put forward to meet the exigencies of the case, and is not supported by the evidence. He spent the evening of August 5th with her, left her about 1 o'clock at night, and went to Port Byron, three miles distant, and there boarded the caboose of an extra freight train, for the purpose of riding back to Newark. The train was about a quarter of a mile long, com-

posed of 38 empty and 18 loaded cars. On August 3d, West wrote a letter to Miss McNierny, telling her that he would come to Weedsport to see her on train No. 2, Wednesday, the 5th. Van Wie says that he did not know until the morning of the 5th, or the afternoon before, that West was "going" to Weedsport. On the 4th, West told three of the witnesses that he was going to Weedsport the next day, to see his girl, and have a good time, and that he intended to ask Van Wie the next morning if he couldn't go on the passenger train No. 2, at 11:55. Robinson testified that during the forenoon of the 5th, West was at work as usual, with his work clothes on, but that on the arrival of train No. 2 he had on his good clothes, and said he was going on that train to see his girl. He said nothing to any one, so far as it appears, of any purpose in going to Weedsport except to see Miss McNierny. Van Wie says that the business of car inspecting, such as West did, required him to go under and climb over the cars, examine the brakes and brake chains, and was somewhat dirty work, likely to soil the person and clothing. When train No. 2 arrived at Weedsport, Miss McNierny met him, and they walked together to the factory where she was employed. There he left her, and she does not know what he did until evening. He then rejoined her, and they were together until near 1 o'clock at night. Traub was about the station during the late afternoon and early evening, and saw nothing of West. In the evening he met West in the company of friends on the street, and they greeted each other, and passed on. There is no evidence in the case that West went to Traub's place of work, that he made any inspection of his work, or that he did anything at or about the company's premises. All that appears is that the primary purpose of his going was to enjoy the society of this young woman, and that he was directed by the foreman to "look around," and see whether Traub was attending to his business. Van Wie, who was appointed foreman in April, 1891, says that West was in the habit of going to Weedsport every chance he could get, to see this young woman. "He didn't get permission from me at all times; sometimes he did; sometimes he would go in the nighttime, and sometimes in the daytime, and come back in the night." On August 4th, Van Wie received a message from Garrison that a car at Jordan required repairs, which called for tools and asistance, and directed him to send the necessary help. Van Wie replied that he would send wheels, and help fix the car, the next day, and had advised Traub accordingly. The next day Van Wie sent one of his workmen, Cosgrove, to help Traub, and they left Weedsport together at about 10 or 11 o'clock a. m. They completed the work, and Traub returned to Weedsport between 4 and 5 o'clock the same afternoon. Van Wie says that he did not know whether Traub would be at Weedsport while West was there. "If he got there when Traub was away at work, he wouldn't be able to see how he did his work. I sent West to see how the business was going on, and whether this man was attending to his business or not, inspecting the cars; to see whether everything was all right about the cars that came there that day. Maybe it would take West ten or fifteen minutes to find out; maybe half an hour; maybe all afternoon. I never found that Traub was doing his business wrong. I always

found things in good running order. I had been to Weedsport to see the way he was conducting his business. I don't think I ever sent any man besides West to discover what Traub was doing." The claim that Van Wie was vested with some authority or power of supervision over Traub rests upon evidence of a very unsatisfactory character. The facts, circumstances, and conditions shown by the evidence hardly warrant the inference that Traub was a subordinate of Van Wie, subject to his control or direction. Assuming, however, the fact to be that Garrison directed him to see that Traub attended to his duties, the inference would be that Van Wie's personal supervision or inspection was demanded, so that the benefit of his personal experience and criticism should be received; and that he was not at liberty to delegate the duty to this boy, or any other workman. The duty rested upon him as foreman, and it was such supervision as a foreman would be necessarily required to exercise in person, and, consequently, not to be delegated to another. Van Wie says there was no reason why he could not have gone himself, and there was no special reason or necessity for any one to go there that day. Apparently the next week, or the week after, would answer as well. It was because West very much desired to go there to see Miss McNierny that Van Wie sent him to look around, and see whether Traub was attending to business. Evidently he had no intention of sending him to Weedsport for that purpose until West requested leave of absence and passage upon the train.

In answer to the appellant's contention that, if West was sent to Weedsport, it must have been for the purpose of inspecting Traub while at work, the respondent replies: That the presence of Traub was not necessary in order that West might ascertain whether he was attending to his duties or not. That could be ascertained by inquiry, by an examination of the cars which he had worked upon and which were there, or by observing that there were no cars, and that, therefore, his work had been performed. That Van Wie knew Straub was competent, and it was not his competency that he wished to ascertain, but whether he was prompt or dilatory at his work; whether he permitted cars to accumulate, or, by prompt inspection, and by repairing when necessary, kept his yard clear. If he suffered work to accumulate, West was capable of ascertaining that fact by visiting the yard, and could report to his foreman the occasion for such accumulation. If the yard was clear, West could, unquestionably, observe it, and so report to Van Wie. So that the fact whether the yard was kept reasonably clear could be readily ascertained by West, and equally as well whether Traub was present or absent. And that, in view of the fact that "he had personally to do no work" in ascertaining whether Traub performed his duties properly, the circumstance that he had discarded his work clothes was of no importance or materiality in weighing the evidence, or in considering the fair and reasonable inferences and probabilities of the case.

Now, we must assume the fact to be that neither West nor Van Wie knew whether there would be any, or how many, cars in the yard, or whether they had been promptly and properly inspected or not inspected at all. If there were any there, it was his duty to ascertain,

"by an examination of the cars which Traub had worked upon," whether the inspection had been done in a proper and workmanlike manner. In other words, it might become necessary to go under and climb over the cars, to examine and test the brakes and brake chains, etc., and in the performance of this duty his clothes would become more or less soiled; consequently, the fact that he was "all dressed up" is not to be considered as a circumstance of but slight importance. It is not true, therefore, that West was not expected to do any manual work, for there is no evidence to that effect, and the inference is the other way. Van Wie says it might take West all the afternoon,—not, of course, to ascertain "by inquiry" how long the cars that might be there had been accumulating, but to perform the duties of actual inspection and examination of their condition, in order to ascertain whether Traub had properly performed his duties in that regard. But it is assumed by respondent's counsel that West was simply required to ascertain by inquiry and by observation of the cars in the yard whether Traub was prompt or dilatory in the performance of his duties, whether he suffered cars to accumulate, or, by prompt inspection and repairing, kept his yard clear. Of whom would he make inquiry? Certainly not of any workman in the yard with Traub, for he had no one to assist him, nor had he any foreman or overseer there. Who would be likely to give West information as to the particular days or times the several cars came into the yard, how long each of them had been standing there, whether they had been inspected and repaired, and, if so, why they were not cleared of the yard, or whether any of them had been condemned, etc.? In one word, how would he ascertain whether Traub was justly chargeable with negligence in failing to perform the duties intrusted to him? Then, again, Van Wie must have known that Traub would not be there; at least he had no reason to expect that he would finish his work at Jordan in time to return to Weedsport in the afternoon. And he must have known also that Traub would be unable to do but little, if any, work or inspection in the yard in the forenoon of that day. Consequently, if several cars had come into the yard the day before, or a couple of days before, Traub might not have had sufficient time or opportunity to attend to them all, and there would be nothing to indicate to West that Traub was dilatory. But it seems that there was no accumulation of cars, for Traub says that after his return he went to the station, to see if there were any orders for him, and found that no cars had come into the yard during his absence. Then, again, if Traub is to be believed (and we see no reason why he should not be in respect to this matter, although he was defendant's servant), West said nothing to him about calling at the yard when Traub passed him by on the street. He was not seen by any other witness until early in the evening.

Counsel makes the statement, by way of argument, that the fact that West was attentive to this young woman, and was desirous of going there to see her, doubtless influenced the foreman in sending him there in preference to some other subordinate; that, if Van Wie knew that West was a good and trusty young man, and knew also that he was engaged in an honorable love affair at Weedsport, the fact that

45 N.Y.S.—7

he gave the young man the preference in assigning him to this duty over his associates was very commendable, and rather suggests sincerity of character than tend in any way to detract from his credibility. But the only inference that can fairly be drawn from the evidence and the circumstances is that Van Wie had no intention of sending West there, but simply that he expressed his desire to go, and requested permission and passage upon this train. And, having given him leave of absence for the purpose of meeting this young woman, Van Wie (we will assume) requested him to look around, and to see whether Traub was attending to his duties, and kept his yard clear. He was not sent there for any such purpose, but the primary purpose of his going was for pleasure, and, incidentally, to inspect Traub's cars. Having donned his good clothes, he was not in the attire of a workman; nor did he go there in that character; nor could he fully or properly perform the usual work of car inspecting, if there were any cars there requiring it; nor was Van Wie vested with any implied authority to delegate to a mere workman the performance of the duties appertaining to a foreman.

Counsel argues that, if West did in fact go to Weedsport upon this business for Van Wie, it is unimportant whether he was directed or simply permitted to go, nor is it required that such should be the only reason of his going. Apparently, the only reason for his going was to see this young woman, for the foreman had no intention of sending him on any such business on that day. If he had been really sent there in the character and habiliments of a workman, he would not cease to be such while seeking his own pleasure after the completing of his duties, and while returning in a seasonable time and in a proper manner. But here the circumstances are different. According to Van Wie's testimony, West might perform his duties or acquire the information in 15 minutes, or maybe half an hour; and doubtless West had no expectation or intention of doing anything in the way of inspecting the cars that would soil his clothes, or impair his appearance. Evidently it is, upon the whole evidence, and from all the circumstances, the sending of West to inspect Traub's work was a mere pretext, as assumed as a color or cover for the real reason or motive in permitting him to leave his work, and to afford a color of right, as against the company, to ride upon the passenger train. However all this may be, there are other important circumstances that require consideration in determining the defendant's liability. Van Wie had a pass for himself and his men, including West, which was good upon freight trains. Garrison says it was to enable him and his men, when called away to work at a wreck, to return, if necessary, upon a freight train. Van Wie exhibited this pass to the conductor of passenger train No. 2, and by virtue of it West was accorded passage to Weedsport, but Van Wie retained possession of it. West had no pass, nor did he make application for one while at Weedsport. If it were true that he was there on any legitimate business connected with the company, it became the legal duty of the company to afford him the means of transportation home; and it must be assumed that, if information of the fact had been given, such duty would have been readily fulfilled, and the means of passage supplied, either upon a passenger or a

freight train.    Transportation on the passenger train leaving Weeds-port at 8:12 p. m., and arriving at Newark at 8:49, could have been secured by telegraphic orders.  If, as it seems to appear, there were no accumulation of cars in the yard, West had the whole afternoon and evening in which to enjoy himself, but he took no steps to procure transportation.  If such a request had been made, the fact would have been disclosed to the superior officers whether he was there on legitimate business, or on a mere pleasure jaunt, or of both combined; and, if so, whether the one was a mere pretext for the other, and whether the act of the foreman in procuring him transportation on the strength of his pass was a wrongful diversion of its purpose, and constituted an abuse of his position and authority.  If West is to be judged by his acts and conduct, the matter of fact is that he had no intention of procuring a return pass, but that he went to Weedsport with the fixed intention of delaying his return until the arrival of the freight train after 1 o'clock in the morning.  If he had asked for a pass on this train, are we at liberty to assume that it would have been granted?  Did the company, under such circumstances as existed here, impliedly undertake to transport West on this freight train at the time he took passage?  Can it be justly held that it was with the implied consent of the company that West might be at liberty to post-pone his return and take passage on this freight train at 2 o'clock in the night?  Was it by the defendant's implied permission that he de-layed returning to Newark at this unseasonable hour, and by this mode of conveyance?  If the deceased had taken passage on the pas-senger train, he would not have come to his death by reason of the negligence of a drunken employé.  Was he at liberty to impose upon the company a greater risk and responsibility than it would oth-erwise have assumed?  If the employé loses sight of the purposes for which he was sent, viz. to attend to a particular business, departs from the line of his duty, and for his own convenience and pleasure delays his return until after midnight, and then takes a mode of conveyance that is not considered as safe as the one which he might have taken in a reasonable time after performing his duties, and sustains injuries by the act of a brakeman, may the company be charged with liability upon the ground that the latter was his "co-employé," and the com-pany was negligent in retaining him in its employ?  Is he at liberty, under such circumstances, to create such brakeman a co-employé pro hac vice?  Surely, the company ought not to be charged by implica-tion with notice of his presence on this train.  It was not by any fault of the company that he was obliged to take this train, and he was not being carried as a car inspector or repairer because of any exigency of the service demanding or requiring it.  It was not by reason of any necessity or exigency of the business that he was riding on this freight train.  There is no pretense whatever that his work detained him until it was too late to take the passenger train at 8:12 p. m.  He was not, therefore, put in a position where he was called upon to ride upon a freight train in order to return home in time for work on the following day.  Really, it would seem that he was returning from a visit to Miss McNierny, rather than from the business of the company.  In Pendergast v. Railway Co., 10 App. Div. 207, 211, 41 N. Y. Supp.

927, it was assumed, without deciding, that plaintiff's intestate was, notwithstanding he had finished his day's work, still in the employ of the company, and that he was a fellow workman with the conductor, and not in the position or relation of a passenger, yet the company was bound to furnish him a "safe place." There the employé was riding as of right upon this very train, but here the deceased was not. Had he any legal right to make himself a co-employé with this brakeman? Must he not be considered in the relation of a passenger riding without right in the caboose of a freight train? Eaton v. Railroad Co., 57 N. Y. 382.

Evidence was given tending to show that it was a general and notorious custom upon this railroad for employés to be permitted to ride upon its freight trains without exhibiting a pass, and that this custom was especially true of car inspectors going to and returning from their work. Appellant's counsel has pointed out defects in this proof of custom in essential particulars, and especially in its application to the circumstances of this case. And, since West was not in the attire of a workman, the conductor had no right to assume, nor could he rightfully take his word for it, that he was returning from work or business of the company, and it was his duty, under the circumstances, to deny him passage; and the company therefore is not bound by his assent. When employés are attired in work clothes, that is, of course, some indication to the conductor that they are going to or returning from work. But here the case is entirely different. We are of the opinion, therefore, that the plaintiff is not entitled to recover upon the case presented.

Judgment reversed, and new trial granted, with costs to abide the event.

FOLLETT, J., concurs.

HARDIN, P. J. (concurring). The evidence seems to be insufficient to establish that the deceased was rightfully upon the train at the time he received the injuries which caused his death. Because of the absence of sufficient evidence to warrant the jury in finding that he was rightfully upon the train at the time of his injuries, there should be a reversal. Robertson v. Railroad Co., 22 Barb. 91; Morris v. Brown, 111 N. Y. 328, 18 N. E. 722, and cases cited; Eaton v. Railroad Co., 57 N. Y. 382. The foregoing grounds, as well as those suggested in the opinion of GREEN, J., lead me to vote for a reversal.

WARD, J., dissents.